**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 14-cv-3242-WJM-KLM

WARAD WEST, LLC, and
ANTHONY CAFORIO,

      Plaintiffs,

v.

SORIN CRM USA INC.,
SORIN GROUP USA, INC.,
SORIN GROUP ITALIA SRL, and
SORIN SPA,

      Defendants.

---

**ORDER GRANTING MOTION TO DISMISS FOR LACK OF JURISDICTION AND
MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM**

---

      Plaintiffs Warad West, LLC, and Anthony Caforio (together, "Caforio") allege

breach of contract and related causes of action against Defendants Sorin CRM USA

Inc. ("Sorin CRM"), Sorin Group USA, Inc. ("Sorin USA"), Sorin Group Italia SrL ("Sorin

Italia"), and Sorin SpA ("Sorin SpA") (collectively, "Defendants").  Before the Court is

Sorin Italia's and Sorin SpA's Motion to Dismiss Pursuant to Rules 12(b)(2) and

12(b)(6) ("Rule 12(b)(2) Motion").  (ECF No. 18.)  Also before the Court is Sorin CRM's

and Sorin USA's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)

Motion").  (ECF No. 16.)  For the reasons explained below, the Court grants both

motions without prejudice.

## I.  BACKGROUND

      The Court may consider more materials when resolving the Rule 12(b)(2) Motion

than it may consider when resolving the Rule 12(b)(6) Motion.  (*Compare* Part II.A.1, *infra*, *with* Part II.B.1, *infra*.)  The Court will therefore reserve a more detailed statement of facts for below, in the context of analyzing each motion.  Nonetheless, the following general background appears undisputed.

Sorin CRM is in the business of cardiac rhythm management products such as pacemakers.  (ECF No. 18 at 3.)  Sorin CRM (a Delaware corporation) is wholly owned by Sorin USA (also a Delaware corporation), which is wholly owned by Sorin Italia (an Italian limited liability company), which is majority-owned by Sorin SpA (an Italian corporation).  (ECF No.1 ¶¶ 4–6.)  This lawsuit presents a dispute between Sorin CRM and Caforio, who worked for many years as a independent salesman for Sorin CRM.  (*Id.* ¶ 8.)

## II.  ANALYSIS

### A.    Rule 12(b)(2) Motion

#### 1.    Personal Jurisdiction Standard

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) is to test whether the Court has personal jurisdiction over the named parties. The Tenth Circuit has established a two-part test for personal jurisdiction: "First, we ask whether any applicable statute authorizes service of process on defendants.  Second, we examine whether the exercise of statutory jurisdiction comports with constitutional due process demands."  *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Colorado's long-arm statute "confers the maximum jurisdiction permissible consistent with the Due Process Clause." *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005) (citing Colo. Rev. Stat. § 13-1-124). Thus, the Court need only address the constitutional question of whether the exercise of personal jurisdiction over Sorin Italia and Sorin SpA (the "Italian Entities") comports with due process. *Dudnikov*, 514 F.3d at 1070 (noting that the inquiry into whether any statute authorizes service of process "effectively collapses into the second, constitutional, analysis" in Colorado).

The plaintiff bears the burden of establishing personal jurisdiction over a defendant. *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984). When the district court does not hold an evidentiary hearing before ruling on jurisdiction, "the plaintiff need only make a *prima facie* showing" of personal jurisdiction to defeat a motion to dismiss. *Id.* A *prima facie* showing is made where the plaintiff has demonstrated facts that, if true, would support jurisdiction over the defendant. *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998). To defeat the plaintiff's *prima facie* case, a defendant "must present a compelling case demonstrating that the presence of some other considerations would render jurisdiction unreasonable." *Id.* (internal quotation marks omitted).

The Court will accept the well-pleaded allegations (namely, the plausible, nonconclusory, and nonspeculative facts) of the complaint as true to determine whether the plaintiff has made a *prima facie* showing that personal jurisdiction exists. *Dudnikov*, 514 F.3d at 1070. Any factual conflicts must be resolved in the plaintiff's favor. *Wentz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).

2.    Personal Jurisdiction Analysis

Caforio does not attempt to establish the Italian Entities' individual contacts with

Colorado but instead relies on an alter ego theory by which he hopes to attribute Sorin

CRM's and Sorin USA's contacts to the Italian Entities.  (ECF No. 36 at 1.)  "When a

subsidiary of a foreign corporation is carrying on business in a particular jurisdiction, the

parent company is not automatically subject to jurisdiction in that state because of the

presumption of corporate separateness."  4A Charles Alan Wright et al., Federal

Practice & Procedure § 1069.4 (3d ed., Apr. 2015 update) ("*Wright & Miller*").

Nonetheless, Caforio's alter ego theory of personal jurisdiction has been "consistently

acknowledged" in the federal courts.  *Patin v. Thoroughbred Power Boats, Inc.*, 294

F.3d 640, 653 (5th Cir. 2002); *see also* 4A *Wright & Miller* § 1069.4 n.12 (citing cases).

Thus, where a subsidiary may be said to be "doing the business of the parent" in a

particular state, the parent may be subject to personal jurisdiction in that state.  *Quarles*

*v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1364 (10th Cir. 1974).

To succeed on this theory of jurisdiction, "the plaintiff bears the burden of

demonstrating a prima facie case."  *First Horizon Merch. Servs., Inc. v. Wellspring*

*Capital Mgmt., LLC*, 166 P.3d 166, 178 (Colo. App. 2007).  Although the requirement to

present a *prima facie* case could be interpreted as a requirement to present a *prima*

*facie* case of all elements of a veil-piercing or alter ego claim, the Court does not

believe it extends that far.  The Tenth Circuit has instructed district courts "to keep the

[Rule] 12(b)(2) and [Rule] 12(b)(6) analyses distinct."  *Newsome v. Gallacher*, 722 F.3d

1257, 1270 (10th Cir. 2013).  Requiring a *prima facie* case of all veil-piercing elements

4

in a jurisdictional (Rule 12(b)(2)) analysis would almost certainly destroy that distinction.

Of course, "facts going to the merits of [an alter ego claim] are likely to surface in the context of trying to establish jurisdiction [on the same basis]." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1161 (5th Cir. 1983). But a complete veil-piercing analysis would require a determination of which state's veil-piercing law to apply, and then an element-by-element inquiry into whether the plaintiff has pleaded enough to satisfy each element, including elements such as whether respecting corporate formalities would perpetrate a fraud. *See, e.g.*, *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999) ("Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.").[1] From a personal jurisdiction standpoint, questions such as whether corporate formalities would perpetrate a fraud seem to have little relevance. The ultimate jurisdictional question is whether the subsidiary is "doing the business of the parent." *Quarles*, 504 F.2d at 1364. Thus, the truly relevant inquiry is into "facts concerning the amount of control exercised by the corporate parent over it subsidiary." *SGI Air Holdings II LLC v. Novartis Int'l AG*, 239 F. Supp. 2d 1161, 1166 (D. Colo. 2003). As to these sorts of facts, Caforio alleges the following.

First, it is undisputed that Sorin SpA owns 90% of Sorin Italia, which owns 100% of Sorin USA, which owns 100% of Sorin CRM. (ECF No. 1 ¶¶ 4–6, 48, 51–53.) Thus, the Italian Entities wholly own Sorin USA and Sorin CRM, either directly or indirectly.

---

[1] Delaware law arguably applies to Caforio's alter ego claim (*see* ECF No. 18 at 13 n.6), although the Court need not resolve that question at this point.

Second, Caforio claims that all defendants "have common directors or officers." (*Id.* ¶ 49.) Caforio offers nothing other than this bare allegation to support this claim, and it is at least partly contradicted by an affidavit submitted by Taylor Pollock, Sorin USA's vice president of corporate legal affairs who also has responsibility for Sorin CRM's legal affairs. (ECF No. 18-1 ¶ 1.) Pollock states that none of Sorin CRM's directors are also directors of the Italian Entities. (*Id.* ¶ 7.) Nonetheless, this still leaves open the possibility that Sorin CRM shares common directors with its parent, Sorin USA, and that Sorin USA shares other common directors with the Italian Entities. Thus, Caforio's allegation of interlocking directorates, although conclusory, stands essentially uncontradicted.

Third, Caforio alleges that Sorin CRM shares employees and facilities with other Sorin SpA subsidiaries. (ECF No. 1 ¶¶ 62–63.) The Italian Entities do not dispute this, and Pollock's affidavit confirms it. (ECF No. 18-1 ¶ 1 (discussing Pollock's dual role for Sorin USA and Sorin CRM); *id.* ¶¶ 4, 8 (Sorin CRM and Sorin USA are headquartered in the same location).)

Fourth, Caforio asserts that Sorin CRM does not observe the formal legal requirements that should be observed by an independent corporation. (ECF No. 1 ¶ 65.) Pollock disagrees. Pollock states that Sorin CRM maintains its own bylaws and its board of directors holds annual meetings by written consent. (ECF No. 18-1 ¶ 7.) Pollock also states that Sorin CRM "files all appropriate federal, state and local tax returns, as part of consolidated tax return(s) with [Sorin USA], and pays taxes when due." (*Id.*) Pollock further asserts that Sorin CRM does business in its own name and has its own management team to handle day-to-day business along with assets,

budget, revenues, and expenses. (*Id.* ¶ 6.)  The Court finds that the Pollock affidavit effectively rebuts Caforio's conclusory claim that Sorin CRM does not observe corporate formalities.  Accordingly, the Court will not consider that allegation when determining whether Caforio has stated a *prima facie* case.

Fifth, Caforio alleges that Sorin CRM is grossly undercapitalized and relies entirely on companies above it in the corporate chain for financing.  (ECF No. 1 ¶¶ 50, 54–57, 64.)  In support of this allegation, Caforio attaches Sorin SpA's consolidated financial statements for 2010, 2011, and 2012.  (ECF Nos. 37-1, 37-2, 37-3.)  All three show that Sorin CRM and Sorin USA consistently had equity capital of less than $2,000, as compared to Sorin Italia's approximately €8 million and Sorin SpA's approximately €470 million.  (*See id*.)  The Italian Entities do not contest these figures, nor do they contest the appropriateness of looking solely to equity capital when judging whether a corporation is properly capitalized.  The Court therefore accepts the consolidated financial statements as evidence of significant undercapitalization.

Caforio also asks the Court to consider an affidavit submitted by Clyde Dunavent, a former Sorin CRM sales manager.  (ECF No. 37-4 ¶ 1.)  The Court finds that Dunavent's affidavit undermines rather than supports Caforio's *prima facie* case. Dunavent portrays Sorin CRM as the neglected stepchild of the Sorin family, perennially lamented by management in Europe for its inability to turn a profit, but also ignored by the same management when seeking additional resources intended to help Sorin CRM become consistently profitable.  (*Id.* ¶¶ 3–5, 13.)  Dunavent also states that Sorin's European management generally paid only lip service to the U.S. market, routinely

frustrating its U.S. sales force.  (*Id.* ¶¶ 3, 15–18, 25–29.)  In short, Dunavent portrays

Sorin CRM as anything but a soulless drone doing the parent company's bidding.

Rather, Defendants apparently had real disagreements amongst themselves, and those

disagreements arose from the Italian Entities' disregard, rather than their

micromanagement, of the U.S. subsidiaries.  This lends significant support to Pollock's

claim that Sorin CRM's management team indeed makes the decisions for Sorin CRM.

(ECF No. 18-1 ¶ 6.)

Considering all of the foregoing, the Court finds that Caforio has failed to state a

*prima facie* case sufficient for personal jurisdiction over the Italian Entities on an alter

ego theory.  Whereas most of Caforio's accusations are conclusory (although largely

uncontradicted), Dunavent provides a wealth of context and detail gleaned from his

personal knowledge, and all of it suggests that Sorin CRM and Sorin USA operate with

sufficient independence from the Italian Entities.  The Italian Entities' Rule 12(b)(2)

Motion is therefore granted.[2]  Given this disposition, the Court need not and does not

reach the Italian Entities' argument that the alter ego claim should be dismissed under

Rule 12(b)(6).  (*See* ECF No. 18 at 13–15.)

---

[2] Caforio's counsel claims possession of "additional evidence supporting piercing the veil, but that information was obtained in another case and use of that material will involve revising the protective order in that case or obtaining the information from Defendants in discovery herein."  (ECF No. 36 at 10 n.3.)  Given "the established rule that dismissals for lack of personal jurisdiction are without prejudice," *Arocho v. Lappin*, 461 F. App'x 714, 719 (10th Cir. 2012), Caforio remains free to move for leave to amend to the extent permitted by Federal Rule of Civil Procedure 15.

**B.**     **Rule 12(b)(6) Motion**

1.    <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted." The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted). "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

Sorin attaches a contract (discussed below as the "2010 Contract," ECF No. 17 (filed under seal)), and a purported contract (discussed below as the "2012 Term Sheet," ECF No. 16-1) to its Rule 12(b)(6) Motion. For two reasons, the Court may consider these attachments without converting the Rule 12(b)(6) motion to one for summary judgment. First, "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is

central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss." *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).  Caforio indeed makes the 2010 Contract and the 2012 Term Sheet central to his claims.  (*See* ECF No. ¶¶ 22–24, 31–35.)  Second, if the plaintiff does "not argue before the district court either that the [outside-the-pleadings material] should be excluded from the court's consideration or that the motion should be converted to one for summary judgment . . . , such failure to present an issue to the district court results in waiver." *Id.*  Here, Caforio does not argue for exclusion or conversion to a summary judgment motion.  Indeed, with respect to the 2012 Term Sheet in particular, he argues that Sorin's choice to attach it shows that Sorin has no confusion regarding his claims, and his complaint should therefore survive the Rule 12(b)(6) analysis.  (ECF No. 35 at 4.)  The Court will therefore consider the 2010 Contract and the 2012 Term Sheet in its analysis below.

      2.    <u>Facts</u>

The following facts derive from the complaint (ECF No. 1), the 2010 Contract, and the 2012 Term Sheet.

Caforio (operating through his business entity, Warad West, LLC) was an independent sales representative for Sorin in Arizona from 1993 through 2012.  (*Id.* ¶¶ 8, 13–14.)  Caforio alleges that he developed a substantial book of business and earned commissions of up to $800,000 a year.  (*Id.* ¶ 9.)

From August 2010 through at least December 2012, the 2010 Contract governed Caforio's and Sorin CRM's relationship.  (ECF No. 17.)  The 2010 Contract established

commissions and other terms for a five-year period (*id.*, Schedules 3.01 & 5.02(a)), and also contained a "Territory Buy-Out" clause (*id.* § 5.09).  The Territory Buy-Out clause represents the parties' agreement that Caforio would give up certain sales territory in exchange for a substantial cash payment, paid out in monthly installments over the five years of the contract term.  (*Id.*)  The 2010 Contract states that Arizona law "shall govern [it] in all respects."  (*Id.* § 14.06.)

Caforio claims that, in 2012, he received opportunities and offers from other medical device companies.  (ECF No. 1 ¶ 13.)  This apparently prompted Sorin CRM to begin discussing a complete buyout of Caforio's business.  (*Id.*)

On December 18, 2012, Sorin CRM sent the 2012 Term Sheet to Caforio.  (ECF No. 16-1.)  The 2012 Term Sheet takes the form of a two-page letter from Timothy Dougherty, "Vice President, U.S. CRM Sales, Marketing and Operations."  (*Id.* at 3.)  The Term Sheet begins as follows: "Thanks for a cordial and productive discussion regarding the future of your independent sales representative relationship with Sorin CRM USA, Inc.  This letter summarizes the key terms of Sorin's offer, which, upon agreement, we would then incorporate into a Mutual Termination Agreement."  (ECF No. 16-1 at 2.)  The Term Sheet then contains headings for "Timing," "Continuing Commissions," "Continuation of Monthly Buyout Amount," "Ongoing Obligations," "Announcement," "Non-Compete," and "Miscellaneous."  (*Id.* at 2–3.)  The terms proposed under each heading are as follows:

•     *Timing*.  The 2010 Contract would "terminate effective December 31, 2012."

- *Continuing Commissions*.  Through August 1, 2015 (*i.e.*, what would have been the end of the 2010 Contract), Caforio would continue to receive commissions at specified percentages based on the product sold.

- *Continuation of Monthly Buyout Amount*.  Caforio would continue to receive the monthly installment payments required by the 2010 Contract's Territory Buy-Out clause.

- *Ongoing Obligations*.  Beginning January 1, 2013, Caforio would have no sales or service responsibilities to Sorin CRM.

- *Announcement*.  "We would like a clear announcement [of Caforio's new status] to the field and relevant customers, but would of course welcome your input on how you would like to announce your departure and communicate your future plans."

- *Non-Compete*.  Through August 1, 2015, Caforio could not work directly or indirectly for any other company in the cardiac rhythm management business.

- *Miscellaneous*.  "Obviously, it is important to Sorin that we have a smooth transition of accounts and also would require that both you and Sorin execute a standard mutual waiver and release."

(*Id.*)  In short, the 2012 Term Sheet proposed that Caforio give up his business in exchange for the continuing Territory Buy-Out payments and another two-and-a-half years of commissions on future sales in what otherwise would have been his sales territory.  The 2012 Term Sheet concluded, "In the event you would like to pursue this

offer, please let me know by December 25, 2012." (*Id.* at 3.)

Caforio accepted this offer and "announced his retirement to the physicians and medical staffs with whom he worked as well as personnel at Sorin." (ECF No. 1 ¶¶ 13–14.) Caforio then left on a humanitarian relief trip to Haiti. (*Id.* ¶ 14.) "Upon Caforio's return to Arizona," however, "he was apprised by Sorin's in house counsel that Sorin could not honor its contract. Sorin refused to account to [Caforio] for the sales efforts and commissions in [Caforio's old] territory and refused to pay [Caforio] pursuant to the 2012 [Term Sheet]." (*Id.* ¶ 16.) "On or about May 24, 2013, Sorin advised [Caforio] that Sorin could not place representatives into accounts, develop accounts in Arizona and pay the commissions . . . Sorin was obligated to pay [Caforio]." (*Id.* ¶ 17.) Caforio alleges that Sorin CRM further "adopted a corporate policy against servicing the accounts which would have earned [Caforio] a commission . . . . Sorin refused to call on accounts which would have earned [Caforio] a commission . . . ." (*Id.* ¶ 18.)

Caforio also claims that Sorin defamed him by:

> (a) advising [his former] accounts that [Caforio] had simply quit working for Sorin and walked out, (b) telling customers that [Caforio] had abandoned the accounts, (c) telling customers that Sorin was precluded from calling on the accounts due to legal threats from [Caforio], (d) that [Caforio] had sued other Sorin representatives and Sorin, (e) telling customers that none of [Caforio's] previous customers could do research for Sorin, (f) telling co-workers that Caforio is a liar, not trustworthy and a bad person, and (g) advising its employees to have customers send inquiries to [Caforio] after [Caforio's] service responsibilities expired, knowing full well that [Caforio was] not authorized to service Sorin's accounts.

(*Id.*) Caforio claims that all of this made it impossible for him to "salvage the value of

13

[his] business." (*Id.* ¶ 19.)

Based on these allegations, Caforio brings the following causes of action against Sorin CRM:

- Count One: Breach of the 2012 Term Sheet;

- Count Two: Fraud, claiming that Sorin CRM fraudulently induced Caforio into the 2012 Term Sheet;

- Count Three: Rescission of the 2012 Term Sheet;

- Count Four: Breach of the 2010 Contract;

- Count Five: Interference with Business Relations and Prospective Economic Advantage; and

- Count Six: Defamation.

(*Id.* ¶¶ 22–44.)  Caforio also alleges an alter ego claim (Count Seven) against Sorin USA.[3]

### 3. Rule 12(b)(6) Analysis

#### a. *Law Applicable to Tort & Contract Claims*

At the outset, the Court must determine which state's law to apply to Caforio's claims.  In making this determination, the Court generally applies Colorado's choice-of-law rules.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941) (district

---

[3] Technically, Count Seven alleges an alter ego claim against all Defendants, including Sorin CRM and the Italian Entities.  As discussed above, the Court lacks personal jurisdiction over the Italian Entities, so Count Seven fails for want of jurisdiction as to them.  As for alleging alter ego against Sorin CRM, neither Caforio's complaint nor his response to the Rule 12(b)(6) Motion contains any hint that he seeks reverse veil-piercing (*i.e.*, holding the subsidiary liable for the debts of the parent).  Rather, he plainly seeks to hold the parent (Sorin USA) liable for the debts of the subsidiary (Sorin CRM).  Thus, the Court considers Count Seven to apply only to Sorin USA.

courts sitting in diversity must apply choice-of-law principles of the state in which the

court sits).  Here, however, the parties agree that Arizona law governs Caforio's tort and

contract claims (*i.e.*, Counts One through Six), either by explicit contractual agreement

or through the "most significant relationship" test, which Colorado follows.  (*See* ECF

No. 16 at 4; ECF No. 35 at 4.)  "[W]here the parties agree as to which substantive law

controls in a diversity case, the Court can, and ordinarily should, accept such a

concession."  *Precision Fitness Equip. of Pompano Beach, Inc. v. Nautilus, Inc.*, 2010

WL 551404, at *3 (D. Colo. Feb. 11, 2010).  The Court will therefore apply Arizona law

to Caforio's tort and contract claims.  Caforio's alter ego claim against Sorin USA

(Count Seven) is addressed separately at Part II.B.3.f, *infra*.

> b.   *Counts One & Three: Breach of the 2012 Term Sheet & Rescission of the 2012 Term Sheet*

Sorin CRM contends that Caforio's Count One fails to state a claim because the

2012 Term Sheet did not create a contract.  (ECF No. 16 at 5–6.)  Resolving this

argument, however, requires extended discussion of how the argument came to be

presented to this Court.  That discussion shows a breakdown in the meet-and-confer

process.

The undersigned's revised practice standards require parties to confer before

one of them files a Rule 12(b)(6) motion:

> Motions brought pursuant to [Rule 12(b)(6)] are strongly discouraged if the defect is correctable by the filing of an amended pleading.  Counsel should confer prior to the filing of a Rule 12(b)(6) motion to determine whether the deficiency . . . can be corrected by amendment, and should exercise their best efforts to stipulate to appropriate amendments.

15

WJM Revised Practice Standard III.D.1.  Seeking to comply with this standard, Sorin

CRM's counsel sent a letter dated January 22, 2015, to Caforio's counsel.  Sorin CRM

has put that letter into the record.  (*See* ECF No. 16-2.)  As to Count One (which

Caforio dubs "Breach of Contract-2012 Agreement"), Sorin CRM's counsel stated that

Sorin CRM is "not aware of a '2012 Agreement' . . . .  We are, however, aware of a

January 31, 2013 'Mutual Separation Agreement' . . .  (the 'MSA')." (*Id.* at 2.)  Counsel

continued, "If this is the contract [Caforio] allege[s] was breached by Sorin CRM USA,

this cause of action should be amended to allege that Sorin CRM USA breached the

MSA, and to identify the specific provisions of the MSA Plaintiffs allege were breached

. . . ." (*Id.*)

Sometime in mid-February 2015, Sorin CRM's counsel transmitted the MSA to

Caforio's counsel.  (*See* ECF No. 16-3; *see also* ECF No. 35-6.)  The MSA is a four-

page contract with all the trappings of a contract (*e.g.*, recitals, numbered substantive

sections, etc.).  (*See* ECF No. 35-6 at 1–4.)  Its terms appear to be fleshed-out versions

of those proposed in the 2012 Term Sheet save for two items: (1) the effective date is

January 31, 2013, rather than the Term Sheet's December 31, 2012; and (2) unlike the

Term Sheet, there is no provision for an announcement of Caforio's separation,

although the parties do "agree to communicate a consistent, agreed a message to

Sorin employees and customers regarding Caforio's departure." (*Id.* §§ 1, 6.)  Caforio

signed the MSA on June 27, 2013; Sorin CRM signed the MSA on July 30, 2013.  (*Id.*

at 4.)

Having received this copy of the MSA from Sorin CRM's counsel, Caforio's

16

counsel responded by letter dated February 19, 2015, which Sorin CRM has also put into the record.  (*See* ECF No. 16-3.)  Concerning the MSA, Caforio's counsel stated that Caforio "had signed and proposed such an agreement (with the same financial terms as the '2012 Agreement'[)]," but Sorin CRM "had never signed or returned it.  In fact, when you sent the signed document to us last week, it was the first time we or our client had seen such a signed agreement."  (*Id.* at 2.)  Caforio's counsel nonetheless refused to amend the complaint: "Since our complaint alleges the contract, breach by Sorin and damages, we do not feel that amendment is necessary."  (*Id.*)

Given this stalemate, Sorin CRM went ahead with its Rule 12(b)(6) Motion, arguing that the 2012 Term Sheet was insufficient to form a contract.  (ECF No. 16 at 5–6.)  Sorin CRM points out, for example, that the Term Sheet calls for a "standard mutual waiver and release" (*see* ECF No. 16-1 at 3), which is supposedly "an essential term that cannot be left for future negotiation."  (ECF No. 16 at 6.)

In response, Caforio's counsel chooses to go outside the pleadings, invoking the MSA even though counsel had previously refused to amend based on that document:

> [The 2012 Term Sheet] was actually followed by a separate but substantially similar agreement dated January 31, 2013, attached as hereto Exhibit "1" [*i.e.*, the MSA].  Sorin did not deliver a signed copy of [the MSA] to Plaintiffs until February 13, 2015, after their receipt of the Complaint which they now attempt to dismiss.  Accordingly, the issue is not whether there was an agreement, but simply when the agreement was sufficiently formed.  The substantive business terms of the [Term Sheet] and the [MSA] are identical.
>
> [Sorin CRM] demanded and received approval by December 25, 2012 establishing the contract date.  The [MSA] was simply to formalize the December 18, 2012 agreement, including the "standard mutual waiver and release."  In either event, [Caforio has] sufficiently identified the contract, its

> breach and the damages in paragraphs 12 to 21 of [his]
> Complaint.

(ECF No. 35 at 4–5.)

This argument is frustrating.  Sorin CRM's counsel gave Caforio's counsel an opportunity to amend and allege the MSA as the basis for Caforio's breach of contract claim, but counsel refused.  Yet Caforio's counsel now invokes the MSA as the document that formalizes the 2012 Term Sheet, providing the terms that would otherwise be missing.

Moreover, Caforio's position cannot be entirely correct because the 2012 Term Sheet contemplated the 2010 Contract's termination on December 31, 2012, whereas the MSA pushes that date to January 31, 2013.  If January 2013 saw no sales on which Caforio should have earned commissions, perhaps it does not matter, but at least in that respect, the MSA cannot be characterized as a simple formalization of the 2012 Term Sheet.

In any event, when deciding a Rule 12(b)(6) motion, this Court may not consider new allegations contained in a plaintiff's response.  *See Silver v. Primero Reorganized Sch. Dist. No. 2*, 619 F. Supp. 2d 1074, 1080 (D. Colo. 2007); *White v. Santomaso*, 2012 WL 364057, at *3 n.4 (D. Colo. Feb. 2, 2012).  Thus, the Court must determine whether the 2012 Term Sheet, on its own, is sufficiently certain to form a contract.  *See Rogus v. Lords*, 804 P.2d 133, 135 (Ariz. Ct. App. 1991) ("For an enforceable contract to exist, there must be an offer, an acceptance, consideration, and sufficient specification of terms so that the obligations involved can be ascertained.").

As noted, Sorin CRM argues that the 2012 Term Sheet cannot be sufficiently

18

certain because it leaves a supposedly material term—the waiver and release—for later

negotiations.  (ECF No. 16 at 6.)  In support, Sorin CRM cites unpublished decisions

from the Ninth Circuit and the District of Arizona discussing the materiality of releases

and waivers in settlement agreements.  (*See id*.)  A release and waiver, of course, is

the *sine qua non* of a settlement agreement; the Court is not certain the same can be

said of an agreement like the 2012 Term Sheet.  Nonetheless, Caforio does not attempt

to distinguish Sorin CRM's authority, but instead relies solely on the fact that the MSA

provides the waiver and release.  Given that the Court, in this procedural posture,

cannot consider the effect of the MSA, and given that Caforio has provided no other

response to this challenge, the Court deems Caforio to have conceded the

indefiniteness of the 2012 Term Sheet.  The Court therefore dismisses Count One.

This dismissal is without prejudice.

In light of the foregoing, Caforio's rescission claim (Count Three) must also be

dismissed.[4]

c.      *Count Four: Breach of the 2010 Contract*

Caforio alleges various breaches of the 2010 Contract:

> [P]recluding Plaintiffs from being involved in product pricing
> negotiations, assessing and offsetting illegal penalties for
> late purchase orders from hospitals, inducing Caforio into an
> agreement in 2012, failing to give Caforio's territory to

---

[4] Sorin CRM further argues that rescission is a remedy, not a cause of action.  (ECF No. 16 at 14.)  During the meet-and-confer process, Caforio's counsel defended the rescission claim by characterizing it as one for declaratory judgment that the contract had been rescinded (ECF No. 16-3 at 3), but in response to the Rule 12(b)(6) Motion, Caforio simply agrees that rescission is a remedy, not a cause of action.  (ECF No. 35 at 12.)  Thus, in any amended complaint that Caforio might seek to file, Caforio should place his request for rescission in his prayer for relief, rather than pleading a separate cause of action.

> company hired sales representatives, failing to pay
> commissions and by failing to pursue in good faith sales to
> the accounts which were assigned by Plaintiffs back to Sorin
> in exchange for continuing commissions on sales to those
> accounts.

(ECF No. 1 ¶ 12.)  Sorin CRM claims that none of these breaches are grounded in the 2010 Contract's actual terms.  (ECF No. 16 at 7–9.)

Surprisingly, Caforio does not respond to Sorin CRM's arguments in this regard and does not defend his above-quoted allegations of breach.  Rather, Caforio points to a separate allegation, *i.e.*, that Sorin CRM "adopted a corporate policy against servicing the accounts which would have earned [Caforio] a commission under the 2010 and 2012 Agreements."  (ECF No. 35 at 6 (quoting ECF No. 1 ¶ 18).)  Caforio also points to a generic allegation that Sorin CRM "fail[ed] and refus[ed] to pay [Caforio] pursuant to [the 2010 Contract]."  (*Id.* at 7 (quoting ECF No. 1 ¶ 34).)

Caforio's generic allegation of non-payment is the sort of conclusory allegation that "will not do."  *Twombly*, 550 U.S. at 555.  As for the corporate policy against servicing accounts that would have earned Caforio a commission, Caforio appears to be confusing the 2010 Contract with the 2012 Term Sheet (or the MSA).  The 2010 Contract contains no obligation to pay Caforio commissions on sales in Caforio's ceded sales territory.  Rather, Sorin CRM must pay Caforio a fixed amount over time (*i.e.*, the Territory Buy-Out clause).  (ECF No. 17 § 5.09.)

Considering that Caforio failed to defend his allegations of breach specific to the 2010 Contract, the Court again deems Sorin CRM's challenge conceded.  Count Four is dismissed without prejudice.

> d.   *Counts Two & Five: Fraud in the Inducement & Interference with Business Relations and Prospective Economic Advantage*

Sorin CRM argues that Arizona's economic loss rule bars Caforio's fraud and interference claims.  (ECF No. 16 at 10–11.)[5]  The economic loss rule is "a common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property."  *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 P.3d 664, 667 (Ariz. 2010).  Caforio acknowledges this rule, and further acknowledges that it usually bars tort recovery when a contracting party's damages take "'the form of repair costs, diminished value, or lost profits.'"  (ECF No. 35 at 10 (quoting *Flagstaff*, 223 P.3d at 670).)

Given Caforio's evident understanding of the economic loss rule, his response to Sorin CRM's argument is somewhat baffling.  Although Caforio's complaint alleges that Caforio "announced his retirement" (ECF No. 1 ¶ 14), Caforio's response once again goes outside his pleadings, noting that he could go back into the CRM sales business following the expiration of the non-compete period (which expired at the end of last month).  Caforio then claims that Sorin CRM, by fraudulently inducing him into the 2012 Term Sheet, and by speaking ill of him since, has damaged his ability to carry on such a renewed business.  (ECF No. 35 at 10–11.)  In particular, Caforio alleges that he "entered into the 2012 [Term Sheet] with the expectation of receiving not only the benefits under the contract but also preserving [his] ability to engage in the business following the contract termination in 2015, by using [his] physician contacts and past

---

[5] Sorin CRM also argues that Caforio did not plead fraud with the particularity required by Federal Rule of Civil Procedure 9(b).  (ECF No. 16 at 9–10.)  Given the disposition below, the Court need not reach this argument.

business experience." (*Id.* at 11.)  The Court finds Caforio's argument insufficient to sustain Counts Two and Five.

First, just as before, this argument relies on new allegations, which the Court may not consider at this stage.  Second, even if the Court could consider these new allegations, it is not enough simply to allege an expectation that Caforio's ability to work the same territory would remain intact.  Indeed, without an allegation that Caforio affirmatively intends to come out of retirement, this Court would lack Article III jurisdiction to consider the effect of Sorin CRM's alleged wrongdoing on Caforio's ability to resume doing business in his old territory.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563–64 (1992).

For these reasons, Counts Two and Five are also dismissed.  Because the Court is not convinced that Caforio could never plead a fraud or interference claim arising out of the facts he has already alleged, this dismissal is without prejudice.  Nonetheless, to the extent Caforio intends to amend and allege his plans to come out of retirement, and to the extent the amendment is not stipulated, such an amendment (or the accompanying motion for leave to file it) should address the following concerns.

The Court can envision two scenarios: (1) from the start, Caforio intended to come out of retirement in his old sales territory after the non-compete period expired; or (2) Caforio later formed an intent to come out of retirement in his old sales territory (*e.g.*, because Sorin CRM's alleged actions deprived him of income he thought he would have in retirement).  Caforio should specify which of these scenarios applies to him.  Moreover, under either scenario, Caforio should explain how his claims differ from a claim for future lost profits—a form of consequential damages squarely within

22

Arizona's economic loss rule: "'Economic loss,' as we use the phrase, refers to pecuniary or commercial damage, including . . . consequential damages such as lost profits." *Flagstaff*, 223 P.3d at 667.  Caforio should particularly explain how his claimed damages are not simply a consequence of Sorin CRM's alleged contractual breach.[6]

> e.    *Count Six: Defamation*

As noted above, Caforio claims that Sorin CRM defamed him through various allegedly false statements that impugned Caforio's business reputation.  (ECF No. 1 ¶ 18.)  In Arizona, an utterance that "tends to injure a person in his profession, trade or business" can be slander *per se*.  *Modla v. Parker*, 495 P.2d 494, 496 n.1 (Ariz. Ct. App. 1972).  Nonetheless, such an utterance "must prejudice the person in the profession, trade or business in which he is actually engaged." *Id.* at 496.  Sorin CRM accordingly argues that Caforio's defamation claim fails because Caforio was retired when the alleged defamatory statements were made.  (ECF No. 16 at 13.)  Caforio responds by again invoking his ability to come out of retirement (ECF No. 35 at 12), an allegation the Court may not consider.

Caforio also states that Sorin CRM's alleged defamatory statements "at a minimum place [him] in a false light." (*Id.*)  But "[f]alse light invasion of privacy is recognized in Arizona as a tort separate from defamation." *Desert Palm Surgical Grp., P.L.C. v. Petta*, 343 P.3d 438, 449 (Ariz. Ct. App. 2015).  Given that Caforio has not pleaded a false light claim in his complaint, the Court may not presently consider it.

Caforio's Count Six is dismissed without prejudice.

---

[6] Cases regarding individuals attempting to resume their previous business at the end of a non-compete agreement would be particularly helpful.

23

f.    *Count Seven: Alter Ego Against Sorin USA*

Finally, the Court turns to Caforio's alter ego claim against Sorin USA.  This claim, of course, is not a separate basis for liability, but a means of holding Sorin USA liable for whatever damages Caforio may recover against Sorin CRM through his other causes of action.  Because of the Court has dismissed all of those causes of action, Caforio's alter ego claim must likewise be dismissed.  Count Seven is therefore dismissed without prejudice.[7]

## C.    Compliance with WJM Revised Practice Standard III.D.1

Responding to a Rule 12(b)(6) motion by asserting new facts has prompted the undersigned to assess attorneys' fees against a plaintiff's counsel for violation of WJM Revised Practice Standard III.D.1 and 28 U.S.C. § 1927.  *See Butt v. Wright Med. Tech., Inc.*, 2015 WL 4162576, at *3–4 (D. Colo. July 10, 2015).  Having reviewed the parties' letters exchanged pursuant to Revised Practice Standard III.D.1 (ECF Nos. 16-2 & 16-3), and although the matter is a close one, the Court finds that the present circumstances are somewhat less straightforward than those in the *Butt* case, and the Court in its discretion declines to assess fees against Caforio's counsel.  Nonetheless, Caforio's counsel is admonished for defending against the Rule 12(b)(6) Motion with material outside the pleadings.  In light of Revised Practice Standard III.D.1 and Federal Rule of Civil Procedure 15(a)(1)(B), there is essentially no justification for such conduct.  Going forward, the Court expects ample cooperation and good faith from both sides in the meet-and-confer process.

---

[7] The Court need not and does not reach Sorin CRM's argument that Count Seven is insufficiently pleaded.  (*See* ECF No. 16 at 14–15.)

24

### III.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Sorin Italia's and Sorin SpA's Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(6) (ECF No. 18) is GRANTED.  Sorin Italia and Sorin SpA are DISMISSED without prejudice for lack of personal jurisdiction;

2. Sorin CRM's and Sorin USA's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6) (ECF No. 16) is GRANTED without prejudice; and

3. Any motion for leave to file an amended complaint must be filed no later than **August 28, 2015**, and to the extent not stipulated, shall contain the certificate required by D.C.COLO.LCivR 7.1(a).


Dated this 11th day of August, 2015.

BY THE COURT:

_____

William J. Martinez
United States District Judge