**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 14-cv-3242-WJM-KLM

WARAD WEST, LLC, and
ANTHONY CAFORIO,

      Plaintiffs,

v.

SORIN CRM USA INC.,
SORIN GROUP USA, INC.,
SORIN GROUP ITALIA SRL, and
SORIN SPA,

      Defendants.

---

**ORDER GRANTING MOTION TO DISMISS FOR LACK OF JURISDICTION,**
**GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**
**FOR FAILURE TO STATE A CLAIM, AND GRANTING IN PART AND**
**DENYING IN PART MOTION TO AMEND**

---

      Plaintiffs Warad West, LLC, and Anthony Caforio (together, "Caforio") allege

breach of contract and related causes of action against Defendants Sorin CRM USA

Inc. ("Sorin CRM"), Sorin Group USA, Inc. ("Sorin USA"), Sorin Group Italia SrL ("Sorin

Italia"), and Sorin SpA ("Sorin SpA") (collectively, "Defendants").  Before the Court is

Sorin Italia's and Sorin SpA's Motion to Dismiss Amended Complaint Pursuant to Rules

12(b)(2) and 12(b)(6) ("Rule 12(b)(2) Motion").  (ECF No. 56.)  Also before the Court is

Sorin CRM's and Sorin USA's Motion to Dismiss First Amended Complaint Pursuant to

Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6) Motion").  (ECF No. 57.)  Caforio's Motion for

Leave to File Second Amended Complaint (ECF No. 58) is before the Court as well.

This is not the first time in this case that the Court has reviewed and ruled on a Rule 12(b)(2) motion from Sorin Italia and Sorin SpA ("Italian Entities"), or a 12(b)(6) motion from Sorin CRM and Sorin USA.  The Court previously granted Defendants' earlier motions, but without prejudice to amendment.  (*See* ECF No. 40.)  That order remains relevant to certain matters discussed below, and will be referred to herein as the "Prior Order."

For the reasons explained below, the Rule 12(b)(2) Motion is granted and the Italian Entities are dismissed for lack of personal jurisdiction.  The Rule 12(b)(6) Motion is: (i) granted with prejudice as to Caforio's claims for fraud, tortious interference with business expectancy, false light invasion of privacy, and alter ego; (ii) granted with prejudice in part as to Caforio's claim for defamation; and (iii) otherwise denied.  Caforio's Motion to Amend is granted only as to the causes of action that survive the Rule 12(b)(6) Motion (breach of contract and, in part, defamation).

## I.  MOTION TO AMEND (ECF No. 58)

Defendants' two Motions attack Caforio's First Amended Complaint.  (ECF No. 54.)  About three hours after receiving the Rule 12(b)(6) Motion, Caforio moved to file a proposed Second Amended Complaint, which adds further allegations apparently intended to address arguments raised in the Defendants' Motions.  (*See generally* ECF Nos. 58, 58-1, 58-2.)

## A.    Legal Standard

The Court should grant leave to amend "freely . . . when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Court may, however, deny leave to amend in

2

circumstances such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

## B.    Analysis

Defendants argue that this latest proposed amendment is unduly delayed given that most of the additions appear to be based on Caforio's personal knowledge, and therefore should have been included at least in the First Amended Complaint if not the original Complaint.  (ECF No. 61 at 5–7.)  Under the circumstances, however, the Court finds no undue delay in light of Defendants' alternative argument that amendment would be futile.  Defendants claim that the arguments already advanced in their pending Motions apply equally well to the proposed Second Amended Complaint.  (*Id.* at 7–11.)  Accordingly, the Court finds that it may analyze the pending Motions as if directed to the proposed Second Amended Complaint.  When analyzed in that light, some portions of the proposed amendment survive Rule 12(b)(6) analysis and some do not, as explained in Parts III & IV, below.  Accordingly, the Motion to Amend will be granted in part and denied in part to the extent explained below.

## II.  RULE 12(b)(2) MOTION (ECF No. 56)

## A.    Personal Jurisdiction Standard

The purpose of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) is to test whether the Court has personal jurisdiction over the named parties. The Tenth Circuit has established a two-part test for personal jurisdiction: "First, we ask

whether any applicable statute authorizes service of process on defendants.  Second, we examine whether the exercise of statutory jurisdiction comports with constitutional due process demands."  *Dudnikov v. Chalk & Vermillion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008).

Colorado's long-arm statute "confers the maximum jurisdiction permissible consistent with the Due Process Clause."  *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005) (citing Colo. Rev. Stat. § 13-1-124).  Thus, the Court need only address the constitutional question of whether the exercise of personal jurisdiction over the Italian Entities comports with due process.  *Dudnikov*, 514 F.3d at 1070 (noting that the inquiry into whether any statute authorizes service of process "effectively collapses into the second, constitutional, analysis" in Colorado).

The plaintiff bears the burden of establishing personal jurisdiction over a defendant.  *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984).  When the district court does not hold an evidentiary hearing before ruling on jurisdiction, "the plaintiff need only make a *prima facie* showing" of personal jurisdiction to defeat a motion to dismiss.  *Id.*  A *prima facie* showing is made where the plaintiff has demonstrated facts that, if true, would support jurisdiction over the defendant.  *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998).  To defeat the plaintiff's *prima facie* case, a defendant "must present a compelling case demonstrating that the presence of some other considerations would render jurisdiction unreasonable."  *Id.* (internal quotation marks omitted).

4

The Court will accept the well-pleaded allegations (namely, the plausible, nonconclusory, and nonspeculative facts) of the complaint as true "to the extent they are uncontroverted by the defendant's affidavits.  If the parties present *conflicting affidavits*, all factual disputes must be resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party."  *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (internal quotation marks and citations omitted; emphasis added); *see also Dudnikov*, 514 F.3d at 1070.

## B.    Personal Jurisdiction Analysis

It is undisputed that Sorin CRM is wholly owned by Sorin USA, which is wholly owned by Sorin Italia, which is majority-owned by Sorin SpA.  (*See* ECF No. 58-1 ¶¶ 4–6; ECF No. 56-1 ¶¶ 4, 6, 8.)[1]  Nonetheless, "[b]ecause of the presumption of corporate separateness, the parent company is not automatically subject to jurisdiction in that state simply because the subsidiary is carrying on business in the forum state." 4A Charles Alan Wright *et al.*, Federal Practice & Procedure § 1069.4 (3d ed., Dec. 2015 update) ("*Wright & Miller*").  Normally, then, this Court would be required to inquire into the Italian Entities' individual contacts with Colorado.

However, just as in the motion practice leading to the Prior Order, Caforio does not attempt to establish the Italian Entities' individual contacts with Colorado but instead relies on an alter ego theory by which he hopes to attribute Sorin CRM's and Sorin

---

[1] Sorin SpA has very recently merged into an English company named LivaNova.  (*See* ECF No. 70.)  No party has argued that this merger should affect the personal jurisdiction analysis.

5

USA's contacts to the Italian Entities.  (ECF No. 63 at 10–11; *see also* ECF No. 36 at 1.)  Caforio's alter ego theory of personal jurisdiction has been "consistently acknowledged" in the federal courts.  *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002); *see also* 4A *Wright & Miller* § 1069.4 n.12 (citing cases). Thus, where a subsidiary may be said to be "doing the business of the parent" in a particular state, the parent may be subject to personal jurisdiction in that state.  *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1364 (10th Cir. 1974).

To succeed on this theory of jurisdiction, "the plaintiff bears the burden of demonstrating a prima facie case."  *First Horizon Merch. Servs., Inc. v. Wellspring Capital Mgmt., LLC*, 166 P.3d 166, 178 (Colo. App. 2007).  The requirement to present a *prima facie* case could be interpreted as a requirement to present a *prima facie* case of all elements of a veil-piercing or alter ego claim, but this Court ruled in the Prior Order that a *prima facie* case need not extend that far.  (ECF No. 40 at 4–5.)  This is because the Tenth Circuit has instructed district courts "to keep the [Rule] 12(b)(2) and [Rule] 12(b)(6) analyses distinct."  *Newsome v. Gallacher*, 722 F.3d 1257, 1270 (10th Cir. 2013).  Requiring a *prima facie* case of all veil-piercing elements in a jurisdictional (Rule 12(b)(2)) analysis would almost certainly destroy that distinction.

Of course, "facts going to the merits of [an alter ego claim] are likely to surface in the context of trying to establish jurisdiction [on the same basis]."  *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1161 (5th Cir. 1983).  But a complete veil-piercing analysis would require a determination of which state's—or country's—veil-piercing law to apply, and then an element-by-element inquiry into whether the plaintiff has pleaded

6

enough to satisfy each element, potentially including elements such as whether respecting corporate formalities would perpetrate a fraud.  From a personal jurisdiction standpoint, questions such as whether corporate formalities would perpetrate a fraud seem to have little relevance.  The ultimate jurisdictional question is whether the subsidiary is "doing the business of the parent."  *Quarles*, 504 F.2d at 1364.  Thus, the truly relevant inquiry is into "facts concerning the amount of control exercised by the corporate parent over its subsidiary."  *SGI Air Holdings II LLC v. Novartis Int'l AG*, 239 F. Supp. 2d 1161, 1166 (D. Colo. 2003).

As to these sorts of facts, Caforio alleges in the proposed Second Amended Complaint that he has had "numerous interactions" with about a dozen employees from the various Sorin entities (including the Italian Entities), through which he has learned about

> the parent companies' control over Sorin [CRM] and the lack of formal distinctions between the entities.  Sorin[ CRM]'s parent corporations totally control many key aspects of Sorin[ CRM]'s business, including control of product pipeline, yearly sales forecasting, marketing and operating budgets and in depth finances specific to the under capitalization of Sorin [CRM] including the flow of money across the different business units, the use of the term "distributor" when referring to the Sorin [CRM] entity, as well as control over finances and the supply of cash.  Sorin [CRM] personnel had to travel to Europe frequently to seek approval of business operation and obtain capital to operate or to continue operations.

(ECF No. 58-1 ¶¶ 146–56.)

As to these allegations, Caforio faces two substantial obstacles.  The first obstacle is that Sorin USA's in-house counsel, Taylor Pollock, has submitted a declaration contradicting all of them.  (*See* ECF No. 56-1.)  Pollock asserts that,

although Sorin CRM and Sorin USA share an office complex in Arvada, Colorado, and also share some non-management employees, they maintain corporate distinctions both from each other and from the Italian Entities. (*Id.* ¶¶ 11–14, 21–25.)  Sorin CRM specifically maintains control of its own day-to-day business decisions, although its annual forecasts and budgets must be approved by an employee of another Sorin subsidiary, which is not a defendant here. (*Id.* ¶ 18.)  These allegations effectively refute Caforio's allegations, and Caforio has submitted no counter-declarations or other competent evidence in support of his own allegations.[2]  Thus, the Court must accept the Italian Entities' version of the facts as undisputed. *See Wenz*, 55 F.3d at 1505.

Caforio's second obstacle arises from his arguments in the motion practice leading to the Prior Order.  There, he submitted an affidavit from Clyde Dunavent, a former Sorin CRM sales manager. (ECF No. 37-4 ¶ 1.)  Although Caforio believed that Dunavent's affidavit supported his alter ego claim, this Court found precisely the opposite.  Dunavent described Sorin CRM as the neglected stepchild of the Sorin family, perennially lamented by management in Europe for its inability to turn a profit, but also ignored by the same management when seeking additional resources intended to help Sorin CRM become consistently profitable. (*Id.* ¶¶ 3–5, 13.)  Dunavent also stated that Sorin's European management generally paid only lip service to the U.S. market, routinely frustrating its U.S. sales force. (*Id.* ¶¶ 3, 15–18, 25–29.)  Thus, from Dunavent's perspective, Sorin CRM was anything but a front through which the Italian

---

[2] Caforio's counsel cannot claim unfamiliarity with the requirement to submit countervailing declarations.  The Italian Entities' two Rule 12(b)(2) motions in this case both stated, correctly, that such proof would be required under the circumstances. (*See* ECF No. 18 at 5; ECF No. 56 at 8–9.)

Entities exploited the American market.

Given this Court's previous reliance on the Dunavent affidavit, Caforio could be expected to argue in his current briefing that Dunavent's view is incorrect, or at least that the Court's interpretation of Dunavent's affidavit was incorrect.  Caforio does neither.  In fact, he continues to name Dunavent as an individual through whom he has learned about Sorin CRM's alleged lack of separateness from its parent companies. (*See* ECF No. 58-1 ¶ 149.)

In light of the foregoing, dismissal for lack of personal jurisdiction is appropriate. Caforio, however, asks the Court to treat the Rule 12(b)(2) motion "as one for summary judgment and permit [him] the opportunity to proceed with discovery."  (ECF No. 63 at 9.)  In other words, it appears that Caforio is attempting to invoke Rule 12(d), which permits the Court to convert a Rule *12(b)(6)* (not 12(b)(2)) motion to one for summary judgment, and Rule 56(d), which permits the Court to defer deciding a summary judgment motion until the opposing party is able to gather certain necessary facts.

Procedurally speaking, these requests are misdirected.  Rule 12(d) contemplates converting Rule 12(b)(6) motions to motions for summary judgment precisely because Rule 12(b)(6) motions should normally be decided by reference to the complaint alone, whereas summary judgment may be decided on a much broader range of evidence. But Rule 12(b)(2) motions can already be decided on materials beyond the complaint, so there is no need to invoke the summary judgment process.

Nonetheless, the Court will treat Caforio's request as one for jurisdictional discovery.  Such a request must demonstrate "a sufficient factual predicate" to justify such discovery.  *St. Paul Travelers Cas. & Sur. Co. of Am. v. Guar. Bank & Trust Co.*,

2006 WL 1897173, at *4 (D. Colo. July 10, 2006).  This Court has discretion to deny

such requests if there is a "very low probability that the lack of discovery [will] affect[]

the outcome."  *Bell Helicopter Textron, Inc. v. Heliqwest Int'l, Ltd.*, 385 F.3d 1291, 1299

(10th Cir. 2004).

Caforio's request does not demonstrate the requisite factual predicate.  His

counsel does no more than submit a declaration "advis[ing] the Court that there are

facts which bear upon the motions of the Defendants to dismiss . . . which are not

presently available to [Caforio]."  (ECF No. 63-1 at 1.)  But Caforio's counsel does not

say what these facts might be, or how he knows that they exist, except for a claim that

he is aware of facts gleaned from "another action" that are "not available for use without

modification of a protective order or through separate discovery herein."  (*Id.* at 2.)

Caforio's counsel has been saying as much since April 2015.  (See ECF No. 36 at 10

n.3.)  If these facts learned in another lawsuit are indeed as helpful as counsel alleges,

it is inconceivable that over the course of nearly a year he has not yet pursued any

modification of the protective order in that lawsuit.[3]

Moreover, as explained in Part III.H, below, Caforio's alter ego allegations are

actually self-defeating.  Accordingly, the likelihood that jurisdictional discovery will

change the outcome is very low.  Caforio's request for jurisdictional discovery is

therefore denied, and the Italian Entities' Rule 12(b)(2) Motion is granted.

---

[3] If the other lawsuit to which Caforio's counsel refers is *Bio Med Technologies Corporation v. Sorin CRM USA Inc.*, Case No. 14-cv-154, this is particularly inconceivable. The undersigned presides over that case as well and the parties are represented by the same attorneys here.

## III.  RULE 12(b)(6) MOTION (ECF No. 57)

### A.  Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

Caforio attached two purported contracts—the "2012 Term Sheet" (ECF No. 54-1) and the "2013 MSA" (ECF No. 54-2)—to his First Amended Complaint.  Although Caforio does not attach these documents to his proposed Second Amended Complaint, that complaint continues to refer to the same documents as Exhibits A and B.  (ECF No. 58-1 ¶¶ 15, 64.)  The Court therefore presumes that the 2012 Term Sheet and the 2013 MSA will indeed accompany the proposed Second Amended Complaint, and the

Court may consider them as part of its Rule 12(b)(6) analysis.  *See* Fed. R. Civ. P 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In a previous motion to dismiss filed in this matter, Sorin CRM and Sorin USA attached a third contract, the "2010 ISR."  (*See* ECF Nos. 16, 17.)  This Court's Prior Order determined that the 2010 ISR could likewise be considered in the Rule 12(b)(6) analysis given its close relation to the complaint's allegations and Caforio's choice not to argue against its consideration.  (ECF No. 40 at 9–10.)  The 2010 ISR continues to be relevant here, and of the Court will therefore continue to treat it as if attached to the currently operative complaint.

**B.     Factual Allegations**

The Court assumes the following facts to be true for purposes of the Rule 12(b)(6) analysis.

Sorin CRM is in the business of selling pacemakers and other cardiac rhythm management products (hence the acronym, "CRM").  (ECF No. 18 at 3.)  Caforio (operating through his business entity, Warad West) was an independent sales representative for Sorin CRM in Arizona from 1993 through 2012.  (ECF No. 58-1 ¶¶ 1–2, 8–9, 23.)  Caforio developed a substantial book of business and earned commissions of up to $800,000 a year.  (*Id.* ¶ 9.)  Caforio made himself available around the clock for calls from the doctors he serviced and "was unable to take a vacation for more than three consecutive days during his 20 years representing Sorin." (*Id.* ¶ 12.)  He therefore "earned the respect and admiration of the physicians with

whom he worked" and "had an excellent reputation for service and expertise" in his field.  (*Id.*)

From approximately August 2010 through December 2012, Caforio's relationship with Sorin CRM was governed by the 2010 ISR.[4]  (*Id.* ¶ 10; *see also* ECF No. 17.)  The 2010 ISR established commissions and other terms for a five-year period (*id.*, Schedules 3.01 & 5.02(a)), and also contained a "Territory Buy-Out" clause (*id.* § 5.09).  The Territory Buy-Out clause represents the parties' agreement that Caforio would give up certain sales territory in exchange for a substantial cash payment, paid out in monthly installments over the five years of the contract term.  (*Id.*)  The 2010 ISR states that Arizona law "shall govern [it] in all respects."  (*Id.* § 14.06.)

In November 2012, Sorin CRM's vice president of sales, Tim Dougherty, met with Caforio and informed him that Sorin viewed Caforio's commissions as "too 'rich.'" (ECF No. 58-1 ¶ 14.)  Dougherty expressed the company's hope to expand its business in Arizona "through less-expensive internal employee sales representatives," with Caforio's assistance.  (*Id.*)

Caforio does not describe his initial reaction to this proposal.  However, on December 18, 2012, Dougherty hand-delivered a letter to Caforio—the 2012 Term Sheet.  (*Id.* ¶ 15.)  The 2012 Term Sheet is a two-page document, and begins as follows: "Thanks for a cordial and productive discussion regarding the future of your independent sales representative relationship with Sorin CRM USA, Inc.  This letter summarizes the key terms of Sorin's offer, which, upon agreement, we would then

---

[4] "ISR" is the parties' shorthand for "independent sales representative agreement."

13

incorporate into a Mutual Termination Agreement." (ECF No. 54-1 at 2.) The Term Sheet then contains headings for "Timing," "Continuing Commissions," "Continuation of Monthly Buyout Amount," "Ongoing Obligations," "Announcement," "Non-Compete," and "Miscellaneous." (*Id.* at 1–2.) The terms proposed under each heading are as follows:

- *Timing*. The 2010 ISR would "terminate effective December 31, 2012."

- *Continuing Commissions*. Through August 1, 2015 (*i.e.*, what would have been the end of the 2010 ISR), Caforio would continue to receive commissions at either 18.75%, 10%, or 5%, depending on the product sold. To the extent any sale was made in Arizona that was not encompassed by one of these categories, Caforio would still receive a 5% "override commission."

- *Continuation of Monthly Buyout Amount*. Caforio would continue to receive the monthly installment payments required by the 2010 ISR's Territory Buy-Out clause.

- *Ongoing Obligations*. Beginning January 1, 2013, Caforio would have no sales or service responsibilities to Sorin CRM.

- *Announcement*. "We would like a clear announcement [of Caforio's new status] to the field and relevant customers, but would of course welcome your input on how you would like to announce your departure and communicate your future plans."

- *Non-Compete*. Through August 1, 2015, Caforio could not work directly or indirectly for any other company in the CRM business, including but not

14

limited to Biotronik, Boston Scientific, Medtronic, and St. Jude.

•   *Miscellaneous*.  "Obviously, it is important to Sorin that we have a smooth transition of accounts and also would require that both you and Sorin execute a standard mutual waiver and release."

(*Id.*)  In short, the 2012 Term Sheet proposed that Caforio give up his business in exchange for the continuing Territory Buy-Out payments and another 31 months of commissions on future sales in what otherwise would have been his sales territory.  The 2012 Term Sheet concluded, "In the event you would like to pursue this offer, please let me know by December 25, 2012."  (*Id.* at 2.)

Caforio accepted the 2012 Term Sheet by e-mail on December 23, 2012.  (ECF No. 58-1 ¶ 21.)  "Sorin acknowledged [Caforio's] acceptance and confirmed that there was an agreement in place . . . ."  (*Id.*)  Caforio began to announce his departure from Sorin CRM to his customers and Sorin CRM personnel.  (*Id.* ¶ 23.)  Caforio then departed on a humanitarian relief trip to Haiti.  (*Id.* ¶ 24.)

On December 27, 2012, while Caforio was still in Haiti, Sorin CRM's in-house attorney, Pollock, e-mailed to Caforio a draft separation agreement supposedly meant to memorialize the 2012 Term Sheet.  (*Id.* ¶¶ 27–28.)  The draft agreement did not include the 5% override commission.  (*Id.* ¶ 29.)  When Caforio returned from Haiti in early January 2013, he reviewed the draft agreement, reinserted the 5% override commission, added what he describes as "boilerplate additions," and returned the updated draft to Pollock on January 18, 2013.  (*Id.* ¶ 32.)

Pollock responded a few days later stating that the 5% override commission had been a "misunderstanding" and "should be considered revoked." (*Id.* ¶ 33 (internal quotation marks omitted).) Caforio angrily replied, "Let me make myself perfectly clear: *I accepted Sorin's offer*. We have a legally enforceable agreement. I relied on Sorin's offer in the winding down of my practice . . . ." (*Id.* ¶ 37 (emphasis in original; internal quotation marks omitted).) Caforio also had his attorney send a letter to Pollock stating that they considered Sorin CRM's actions to be an anticipatory repudiation of the parties' agreement. (*Id.* ¶ 40.) Pollock did not respond to these accusations, but sent a revised draft separation agreement back to Caforio on January 30, 2013, and again omitted the 5% override commission. (*Id.* ¶ 42.)

On January 31, 2013, another Sorin CRM employee contacted Caforio to arrange for him to return all of the Sorin supplies still in his possession. (*Id.* ¶ 45.) Caforio apparently heeded this request. (*Id.* ¶ 25.)

Around this time, Caforio began to hear from Sorin CRM representatives in Arizona that there was no plan to cover Caforio's customers, and there had been some infighting over whether those customers should be approached at all. (*Id.* ¶¶ 49–51.) On February 15, 2013, Caforio had a conversation with one Sorin CRM employee who told him that the company's regional sales director, Aamir Mahmood, had instructed employees to tell doctors that Caforio was still with the company and to direct all inquiries to him. The same employee told Caforio that Mahmood had made statements such as "Stay away from Caforio, he is a bad guy," "Look up the 'devil' in the dictionary, you'll see his picture there," and, "How could you be friends with that guy? He is

litigious: he sued [certain Sorin sales representatives] for no reason, ruined their lives for two years, he will do the same to you." (*Id.* ¶ 60 (internal quotation marks omitted).) Indeed, from February 2013 "and continuing for at least 18 months thereafter," Mahmood repeatedly expressed his dislike of Caforio "at locations such as management meetings, physician dinners, company dinners and poolside parties at Phoenix area resorts." (*Id.* ¶ 107.) Mahmood stated that Caforio was untrustworthy, unlikable, and litigious, and that Sorin CRM would avoid any sale that might entitle Caforio to a commission. (*Id.*)

Around that same time, another Sorin CRM employee named Shaun Grams began telling "nurses, physicians and technicians" that Caforio had quit without warning, that Caforio was suing Sorin CRM, and that Caforio should no longer be trusted. (*Id.* ¶ 109.) Grams' statements to this effect continued "through at least August 2015." (*Id.*)

Yet another Sorin employee CRM, Tom Sapienza, began spreading allegedly false information in February 2013 and continuing "through at least April 2015." (*Id.* ¶ 110.) Sapienza's comments were similar to those of Grams, adding that Caforio had simply gone on vacation and never come back to work, and that Caforio should not be trusted because he looks for any opportunity to sue. (*Id.*)

It is not clear how much of this came to Caforio's attention at the time. He and Sorin CRM's lawyer, Pollock, continued their back-and-forth regarding the separation agreement at least through June 2013. (*Id.* ¶¶ 62–64.) In the middle of that process, Pollock advised Caforio's attorney "that he 'authorized the processing of [Caforio's] February commission payment in accordance with the [2012 Term Sheet] so that

[Caforio] is not inconvenienced while we finalize the separation agreement.'"  (*Id.* ¶ 55.)

Finally, "after rejecting numerous efforts by Sorin to renegotiate the terms that were previously agreed upon," Caforio signed a version of the separation agreement —the 2013 MSA—on June 27, 2013, and transmitted his signed copy to Pollock.  (*Id.* ¶ 64.)  This version contains the 5% override commission.  (ECF No. 54-2 § 3(b).)  It also contains the non-compete provision through August 1, 2015, that specifically calls out Biotronik, Boston Scientific, Medtronic, and St. Jude as companies for whom Caforio may not work.  (*Id.* § 7(a).)

Caforio never received Sorin CRM's countersigned copy of the 2013 MSA until February 2015—three months after this lawsuit began.  (ECF No. 58-1 ¶ 64.)  Caforio was surprised to learn of the countersigned copy because it bore Pollock's signature dated July 30, 2013, yet Pollock "had approached [Caforio] multiple times after July 2013 in an effort to 'finalize the agreement.'"  (*Id.* ¶¶ 64, 89–94.)  Caforio therefore suspects that Pollock actually signed the agreement after the lawsuit started.  (*Id.* ¶ 95.)

In any event, Caforio claims that his contract with Sorin CRM is collectively embodied in the 2012 Term Sheet and the 2013 MSA.  (ECF No. 58-1 ¶ 64.)  Caforio further claims that Sorin CRM has never fully performed the contract, and in particular, has never attempted to develop his sales territory.  (*Id.* ¶ 81.)

Moreover, Caforio claims that his acceptance of this deal with Sorin CRM was never meant as the beginning of his retirement.  (*Id.* ¶ 30.)  He was only 45 at the time, and when announcing his departure to customers, coworkers, and acquaintances in January 2013, he explained that he intended to reenter the CRM business after his

18

non-compete period expired on August 1, 2015.  (*Id.*)  However, Sorin CRM's employees' negative talk about him has prevented him from reentering the CRM business or anything similar.  (*Id.* ¶¶ 107, 113.)  Caforio alleges at least two instances, one in December 2014 and the other in June 2015, when St. Jude and Medtronic, respectively, chose not to work with him based on what those entities had heard about his supposedly unprofessional departure from Sorin.  (*Id.* ¶ 101.)

Caforio now asserts claims for breach of contract, fraud, tortious interference with business relations and prospective economic advantage, defamation, false light invasion of privacy, and alter ego.  (*Id.* at 26–48.)  Either in whole or in part, Sorin CRM and Sorin USA challenge all of these claims.

This Court previously held, and the parties do not dispute, that Arizona law governs all of Caforio's claims except his alter ego claim.  (*See* ECF No. 40 at 14–15.) As for the alter ego claim, Sorin CRM and Sorin USA affirmatively state that Delaware law should govern given that both are Delaware corporations.  (ECF No. 57 at 12 n.7.) Caforio does not dispute this assertion and cites Delaware law as well.  (ECF No. 62 at 15.)  Accordingly, the Court will apply Delaware law to the alter ego claim.

Except with respect to that alter ego claim, Sorin CRM and Sorin USA do not distinguish between themselves when making their various arguments.  Unless otherwise noted, the Court will refer to them collectively as "Sorin" in the analysis below. This designation is for simplicity only and is without prejudice to future arguments that rely on the distinction between the two entities.

C.      **Breach of Contract (Claim 1)**

Caforio alleges that Sorin breached their contract by, among other things, failing to transition accounts smoothly so as to preserve sales and failing to make a clear announcement of Caforio's departure.  (ECF No. 58-1 ¶ 81(d)–(e).)  The 2012 Term Sheet contemplates such terms, but they do not appear in the 2013 MSA—and the 2013 MSA contains an integration clause: "Except where this Agreement specifically references [the 2010 ISR], this Agreement contains the entire agreement between the Parties with regard to the matters set forth herein."  (ECF No. 54-2 § 12.)  Sorin accordingly argues that Caforio cannot assert breaches based on the 2012 Term Sheet.  (ECF No. 57 at 13–15.)

The Court agrees with Caforio, however, that there is a serious question regarding whether the 2013 MSA exclusively governs the parties' relationship, as opposed to embodying some of the terms on which the parties agreed.  (*See* ECF No. 62 at 17–18.)  Assuming Caforio's allegations are true for present purposes, there is indeed reason to suspect that Pollock never signed the 2013 MSA until this lawsuit began.  If so, there is likely a fact question regarding whether Pollock signed within a reasonable time.  *Cf.* Restatement (Second) of Contracts § 41(1) (1981) ("An offeree's power of acceptance is terminated at the time specified in the offer, or, if no time is specified, at the end of a reasonable time."); *id.* § 41(2) ("What is a reasonable time is a question of fact, depending on all the circumstances existing when the offer and attempted acceptance are made.").[5]

---

[5] It is also conceivable that Pollock in fact signed the 2013 MSA on July 30, 2013, as represented, but intentionally chose not to inform Caforio of that fact.  This would raise similar

If Pollock did not sign within a reasonable time, there is authority in Arizona that the parties may still be bound by the preliminary terms, if sufficiently definite. *See Ry-Tan Const., Inc. v. Wash. Elementary Sch. Dist. No. 6*, 111 P.3d 1019, 1021–22 (Ariz. 2005) (citing Restatement (Second) of Contracts § 27); *Tabler v. Indus. Comm'n*, 47 P.3d 1156, 1159 (Ariz. Ct. App. 2002) (same); *see also Lancer Realty & Invs., Inc. v. Anderson*, 703 P.2d 1225, 1227 (Ariz. Ct. App. 1985) ("A party to a contract cannot be permitted to escape the obligations of an agreement to which he is a signatory by pleading 'no meeting of the minds' just because a condition of that contract has been left to be ironed out later."). Thus, Caforio's view that the 2012 Term Sheet and the 2013 MSA collectively embody the parties' agreed-upon terms is not barred as a matter of law, and the Court rejects Sorin's challenge to Claim 1.

## D.     Fraud (Claim 2)

Caforio argues that Sorin's actions raise an inference that it never intended to honor the 2012 Term Sheet or the 2013 MSA. (ECF No. 58-1 ¶ 85.) Thus, Caforio claims he was fraudulently induced

> to enter into the Mutual Separation Agreement in order [that Sorin could] (a) regain the Arizona territory, (b) avoid paying commissions to [Caforio], (c) place Sorin's employees in the territory to cover sales (which was less expensive for Sorin than [Caforio's] commissions), and (d) prevent [Caforio] from engaging in related business inside of [his] previous territory via the [non-compete agreement] contained in the [2012 Term Sheet].

(*Id.*; *see also id.* ¶ 88.)

---

issues. *See* Restatement (Second) of Contracts § 56 (in general, "it is essential to an acceptance by promise either that the offeree exercise reasonable diligence to notify the offeror of acceptance or that the offeror receive the acceptance seasonably").

Sorin contends that this claim is barred by Arizona's economic loss rule.  (ECF No. 57 at 4–5.)  The economic loss rule is "a common law rule limiting a contracting party to contractual remedies for the recovery of economic losses unaccompanied by physical injury to persons or other property."  *Flagstaff Affordable Hous. Ltd. P'ship v. Design Alliance, Inc.*, 223 P.3d 664, 667 (Ariz. 2010).  It usually bars tort recovery when a contracting party's damages take "the form of repair costs, diminished value, or lost profits."  *Id.* at 670.

In response, Caforio quotes an unpublished Arizona Court of Appeals decision as follows:

> The economic loss rule will not always bar a claim for fraud in the inducement; however, it may be a bar in a case where the claimant does not seek to rescind or reform the contract induced by fraud, but essentially affirms the contract by seeking contract damages under a tort theory . . . .

(ECF No. 62 at 7 (quoting *Maricopa Inv. Team, LLC v. Johnson Valley Partners LP*, 2012 WL 5894849, at *2 (Ariz. Ct. App. Nov. 23, 2012)).)[6]  Caforio then argues that he has "clearly disputed that the 2015 agreement existed thereby precluding the application of the economic loss rule herein."  (*Id.*)

The Court does not follow.  To begin, there is no "2015 agreement" referenced in any of the parties' filings.  Assuming that Caforio intended to refer to the 2013 MSA (which Caforio believes was actually signed by Pollock in 2015), the Court still sees no connection between the quoted language from the *Maricopa Investment* case and Caforio's conclusion.  Caforio is not seeking to reform or rescind any contract.  Indeed,

_____

[6] Sorin likewise relied on this unpublished decision.  (*See* ECF No. 57 at 4, 5.)

22

although his original complaint requested rescission (*see* ECF No. 1 ¶¶ 31–32), he dropped that request from his First Amended Complaint (ECF No. 54) and proposed Second Amended Complaint (ECF No. 58-1).  In addition, the entire thrust of Caforio's current allegations is that he is *at least* seeking to enforce the 2012 Term Sheet. Accordingly, Caforio has failed to show how his allegations fit within the exception to the economic loss rule stated in *Maricopa Investment*.

Caforio additionally argues that the economic loss rule does not apply "where the damages extend beyond those available for breach of the contract."  (ECF No. 62 at 7–8.)  In this vein, Caforio claims that "Sorin's tortious actions damaged [his] ability to carry on [his] business following [the] August 1, 2015 [expiration of the non-compete period]," thus "giv[ing] rise to independent causes of action under tort (defamation, fraud in the inducement, interference with business relations and false light)."  (*Id.* at 8.)

At least as to fraud in the inducement, the Court still does not follow.  Without an election to rescind or reform the contract allegedly embodied by the 2012 Term Sheet and the 2013 MSA, the Court cannot see any damages to Caforio for being fraudulently induced into that agreement other than the amounts he expected to receive under that agreement.  The economic loss rule therefore applies.

The Court grants Sorin's Rule 12(b)(6) Motion as to Caforio's cause of action for fraud (Claim 2).  Moreover, the proposed Second Amended Complaint was Caforio's third chance to plead to this cause of action, after having it dismissed without prejudice from his original complaint with instructions from this Court regarding the effect of the economic loss rule.  (*See* ECF No. 40 at 21–23.)  Given Caforio's "repeated failure to

cure deficiencies" in this claim, *Foman*, 371 U.S. at 182, the Court dismisses it with prejudice.

**E.    Tortious Interference with Business Expectancy (Count 3)**

Caforio claims that Sorin employees' statements to others about his purportedly unprofessional departure, litigiousness, and difficult demeanor have "interfered with [his] ability to enter the medical business in Arizona" or "re-enter the medical device space." (ECF No. 58-1 ¶¶ 101, 103.)  The Court agrees with Sorin that these allegations do not state a *prima facie* claim for tortious interference.  (*See* ECF No. 57 at 5–7.)

The elements of a tortious interference claim in Arizona are:

> (1) The existence of a valid contractual relationship or business expectancy;
>
> (2) knowledge of the relationship or expectancy on the part of the interferer;
>
> (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and
>
> (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1041 (Ariz. 1985).  As to the valid expectancy required by the first element, Caforio must allege "facts showing the expectancy constitutes more than a mere 'hope.'"  *Dube v. Likins*, 167 P.3d 93, 99 (Ariz. Ct. App. 2007).  "As a general rule, an action for tortious interference with a business relationship requires a business relationship evidenced by an actual and identifiable understanding or agreement which in all probability would have been

completed if the defendant had not interfered." *Id.* at 101 (quoting *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So.2d 812, 815 (Fla. 1994)).  Caforio's allegations do not satisfy this standard.  His general intent to return to the medical device sales field after the 31-month hiatus required by the non-compete provision (January 2013 through July 2015) is the sort of "mere hope" that fails to satisfy the first element of a tortious interference claim.

This is Caforio's third iteration of his tortious interference claim.  Moreover, in a previous order, the Court specifically counseled Caforio that "[c]ases regarding individuals attempting to resume their previous business at the end of a non-compete agreement would be particularly helpful" to understanding the scope and effect of this claim.  (ECF No. 40 at 23 n.6.)  Caforio's response to the Rule 12(b)(6) Motion contains no such authority.  (*See* ECF No. 62 at 9–11.)  Indeed, the only case he cites in support of this claim is the unpublished *Maricopa Investment* decision discussed above, which says nothing about tortious interference.  For these reasons, Caforio's cause of action for tortious interference with business expectancy (Claim 3) is dismissed with prejudice.

## F.      Defamation (Claim 4)

Sorin argues that Caforio's defamation claim is barred by Arizona's one-year statute of limitations for such claims.  (ECF No. 57 at 7–9.)  *See also* Ariz. Rev. Stat. § 12-541(1).  Caforio filed this action on November 26, 2014.  (ECF No. 1.)  Thus, the relevant date for this analysis is November 26, 2013.

In Arizona, "[a]n action for defamation accrues and the Statute of Limitations begins to run upon publication [of the defamatory statement]." *Lim v. Superior Court*,

616 P.2d 941, 942 (Ariz. Ct. App. 1980).  Caforio alleges that Sorin employees began to defame him in February 2013, many months before November 26, 2013.  (*See, e.g.*, ECF No. 58-1 ¶¶ 107, 109, 110.)  Caforio insists, however, that he was "removed from the offices, facilities and events where Sorin [employees defamed him] and [he] lacked contact with most of the parties to whom Sorin made these defamatory statements." (ECF No. 62 at 13.)  Caforio thus appears to be arguing for the benefit of the discovery rule, which holds that "a plaintiff's cause of action does not accrue until the plaintiff knows or, in the exercise of reasonable diligence, should know the facts underlying the cause."  *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995).

However, Arizona courts have long held that the discovery rule does not apply to defamation claims unless the defamatory statement "is published in a manner in which it is peculiarly likely to be concealed from the plaintiff, such as in a confidential memorandum or a credit report."  *Clark v. AiResearch Mfg. Co.*, 673 P.2d 984, 986 (Ariz. Ct. App. 1983).  Caforio's allegations do not show this sort of concealment.  To the contrary, he claims he was defamed in relatively public settings "such as management meetings, physician dinners, company dinners and poolside parties at Phoenix area resorts."  (ECF No. 58-1 ¶ 107.)  Thus, the Court agrees with Sorin that, at least as to instances of defamation that took place between February 2013 and November 26, 2013, the statute of limitations bars Caforio's defamation claim.

Sorin argues that this holding should extend further.  Sorin notes that Caforio repeatedly alleges a pattern of defamation beginning in February 2013 and "continuing" for a time period beyond November 26, 2013.  (*See, e.g.*, ECF No. 58-1 ¶ 107

26

("continuing for at least 18 months [after February 2013]"); *id.* ¶ 109 ("[February 2013] through at least August 2015").)  Sorin claims that courts around the country have consistently rejected the idea that defamation should be treated as a "continuing tort," and therefore Caforio's defamation claim entirely fails.  (ECF No. 57 at 8–9.)

In Arizona, however, "[e]ach communication of a defamatory statement, even though identical in content, constitutes a separate publication, giving rise to a separate cause of action."  *State v. Superior Court*, 921 P.2d 697, 702 (Ariz. Ct. App. 1996) (citing Restatement (Second) of Torts § 577A(1) & cmt. a); *see also* Restatement (Second) of Torts § 577A(1) cmt. a ("It is the general rule that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises.").  Thus, taking as true Caforio's allegations that some Sorin employees have repeated their defamatory statements on or after November 26, 2013, Caforio's cause of action for defamation may not be dismissed as to those statements.  Caforio's Count 4 will accordingly be dismissed only as to statements made before November 26, 2013.[7]

### G.   False Light Invasion of Privacy (Claim 5)

In Arizona,

> [o]ne who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if

---

[7] In disclosing damages calculations as required by Federal Rule of Civil Procedure 26(a)(1)(A)(iii), Caforio must ensure that his calculation for harm caused by defamatory statements excludes any claim for damage already done as of November 26, 2013.

> (a) the false light in which the other was placed would be
> highly offensive to a reasonable person, and

> (b) the actor had knowledge of or acted in reckless disregard
> as to the falsity of the publicized matter and the false light in
> which the other would be placed.

*Godbehere v. Phoenix Newspapers, Inc.*, 783 P.2d 781, 784 (Ariz. 1989) (quoting

Restatement (Second) of Torts § 652E).  The "gives publicity" requirement of these

elements is defined by the comments to Restatement (Second) of Torts § 652D.  *See*

*Hart v. Seven Resorts Inc.*, 947 P.2d 846, 854 (Ariz. Ct. App. 1997) ("Although

Restatement § 652E does not define publicity, it refers us to the comments to

§ 652D . . . .").

   According to those comments,

> "Publicity" . . . differs from "publication," as that term is used
> . . . in connection with liability for defamation.  "Publication,"
> in that sense, is a word of art, which includes any
> communication by the defendant to a third person.
> "Publicity," on the other hand, means that the matter is made
> public, by communicating it to the public at large, or to so
> many persons that the matter must be regarded as
> substantially certain to become one of public knowledge.
> The difference is not one of the means of communication,
> which may be oral, written or by any other means. It is one
> of a communication that reaches, or is sure to reach, the
> public.

> Thus [no false light claim arises if one] communicate[s] a
> [matter] concerning the plaintiff[] . . . to a single person or
> even to a small group of persons.  On the other hand, any
> publication in a newspaper or a magazine, even of small
> circulation, or in a handbill distributed to a large number of
> persons, or any broadcast over the radio, or statement made
> in an address to a large audience, is sufficient to give
> publicity . . . .  The distinction, in other words, is one
> between private and public communication.

Restatement (Second) of Torts § 652D cmt. a.

Sorin argues that its alleged defamatory statements about Caforio fail this standard.  (ECF No. 57 at 9–12.)  The Court agrees.  Caforio mostly claims that false statements were spread about him in person-to-person situations.  (ECF No. 58-1 ¶ 118.)  To be sure, he also alleges that statements were made to "large groups, such as at National Sales meetings, [and] Electrophysiology Society meetings," but this is not enough.  (*Id.*)  Implicit in Caforio's allegations is the notion that "the public" really means something more like "the relevant professional community"—in this case, the community interested in CRM and similar matters.  Caforio cites no support for this interpretation, which would, in any event, substantially undermine the Restatement's requirement that publicity be made to "the public at large."  Caforio's cause of action for false light (Count 5) will therefore be dismissed with prejudice.

## H.    Alter Ego (Claim 6)

Sorin USA claims that Caforio cannot properly state an alter ego claim against it. (ECF No. 57 at 12–13.)  Delaware law sets a high bar for alter ego claims.  In particular, "the plaintiff must plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity *designed* to defraud investors and creditors." *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (emphasis added).  "Mere dominion and control of the parent over the subsidiary will not support alter ego liability." *Outokumpu Eng'g Enters., Inc. v. Kvaerner EnviroPower, Inc.*, 685 A.2d 724, 729 (Del. Super. 1996).  Moreover, the cause of action underlying the complaint cannot, without more, be the fraud or injustice that supports veil-piercing.  *See id.* ("The 'injustice' must be more than the breach of contract alleged in the complaint . . . ."); *Trevino v.*

29

*Merscorp, Inc.*, 583 F. Supp. 2d 521, 531 (D. Del. 2008) ("the underlying cause of action, at least by itself, does not supply the necessary fraud and injustice" (internal quotation marks omitted)).  In addition, "the possibility that a plaintiff may have difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil."  *Id.* at 530.  "Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud."  *Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999).

For at least two reasons, Caforio's allegations fail this standard.  First, among lengthy allegations regarding matters such as lack of corporate separateness and undercapitalization, his only attempt to satisfy the created-to-perpetrate-fraud standard is the claim that "Sorin [CRM] had no present ability to honor its obligations when it entered into the Mutual Separation Agreement."  (ECF No. 58-1 ¶ 145.)  This, however, is doubly irrelevant—irrelevant because Sorin CRM's ability to honor its obligations at a certain time in the past says nothing about whether it could do so now, and irrelevant because even present inability to satisfy a judgment is not a fraud or injustice sufficient to pierce the corporate veil.  *Trevino*, 583 F. Supp. 2d at 530.

Second, the whole thrust of Caforio's allegations is that Sorin CRM was not created to perpetrate a fraud, but rather to engage in a legitimate business (creating and marketing CRM devices).  This is a business Caforio himself helped to develop.  Thus, Caforio's own allegations show that he cannot plead an alter ego claim.  *Cf. Trevino*, 583 F. Supp. 2d at 530 (rejecting alter ego claim because the plaintiff's allegations demonstrated that the subsidiary company was established for a legitimate

purpose).  Caforio's alter ego cause of action (Claim 6) will be dismissed with

prejudice.[8]

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Sorin Italia's and Sorin SpA's Rule 12(b)(2) Motion (ECF No. 56) is GRANTED.

2.      Sorin Italia and Sorin SpA are DISMISSED WITHOUT PREJUDICE for lack of

personal jurisdiction.

3.      Sorin CRM's and Sorin USA's Rule 12(b)(6) Motion (ECF No. 57) is GRANTED

IN PART and DENIED IN PART as follows:

   a.      Caforio's Claim 2 (fraud), Claim 3 (tortious interference with business

   expectancy), Claim 5 (false light invasion of privacy), and Claim 6 (alter

   ego) are DISMISSED WITH PREJUDICE;

   b.      Caforio's Claim 4 (defamation) is DISMISSED WITH PREJUDICE only to

   the extent Caforio alleges instances of defamation occurring before

   November 26, 2013; and

   c.      Sorin CRM's and Sorin USA's Rule 12(b)(6) Motion is otherwise denied.

4.      Caforio's Motion for Leave to File Second Amended Complaint (ECF No. 58) is

GRANTED IN PART and DENIED IN PART as follows:

---

[8] This outcome potentially entitles Sorin USA to complete dismissal of itself as a party. However, Sorin USA never argued as much in its filings, and on the present record, the Court cannot be certain that Sorin USA has no connection to the breach of contract alleged in Claim 1 or the defamation alleged in Claim 4.  Accordingly, the Court will not dismiss Sorin USA at this time.

    a.      Caforio may file a Second Amended Complaint containing what is currently stated in ECF No. 58-1, paragraphs 1–83, 106–15, and the prayer for judgment and jury demand following paragraph 156; and

    b.      Caforio shall file his Second Amended Complaint on or before March 31, 2016.

5.    The stay of discovery in this matter (*see* ECF No. 67) is LIFTED.

Dated this 21st day of March, 2016.

BY THE COURT:

William J. Martínez
United States District Judge